UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

SHARON LASKOWSKI,

        Plaintiff,

        v.                                    Case No.   13-C-0304

CAROLYN W. COLVIN,
Acting Commissioner,
Social Security Administration,

        Defendant.

---

ORDER REVERSING THE DECISION OF THE COMMISSIONER
AND REMANDING FOR FURTHER PROCEEDINGS

Sharon Ann Laskowski filed a claim for disability insurance benefits and supplemental security income alleging an onset date of November 3, 2009. On her application, Laskowski listed cervical radiocolopathy and spinal cord decompression; however, the ALJ concluded she suffered from degenerative joint disease, history of central stenosis causing spinal cord compression (status post discetomy and fusion) and depression. (R. 26, 249.) Laskowski's claim was denied initially and on reconsideration. She appeared with counsel at the hearing before an ALJ in Madison, Wisconsin. (R. 51.)

In a decision dated October 21, 2011, the ALJ concluded that Laskowski was disabled from November 3, 2009, through December 16, 2010. (R. 32.) Nevertheless, the ALJ found medical improvement after December 16, 2010, and determined that Laskowski could perform past relevant work as a production assembler and other work in the national economy. (R. 35.) The Appeals Council denied review on February 21, 2013, and the ALJ's decision became the final decision of the Commissioner. Laskowski seeks judicial

review of the determination that she was not disabled after December 17, 2010. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

FACTS

The relevant medical records begin with an October 6, 2006, MRI revealing a bulging disc at L4-L5 level, with significant disk degeneration. (R. 402.) Additionally, there was evidence of mild canal stenosis. (*Id.*) On June 21, 2007, Laskowski visited Dr. Antonio Yuk, a neurological surgeon, after struggling with "tingling in hands and legs, burning sensation in the low back, trouble walking because of poor balance," and "twitch due to nerves being pinched." (R. 400.) At that time, she was taking Skelaxin and Vicodin but was uncertain that the medications were helping. (*Id.*) Dr. Yuk noted that her reflexes were increased, and she had prominent Hoffmann's[1] signs in both hands, cross adductors as well as 4 to 5-feet ankle clonus. Her toes were equivocal, gait was stiff and she was unsteady on tandem gait. (R. 401.) There was no suggestion of serious neural compromise on the MRI of the lumbar spine; however, the brain scan showed a single, small lesion of demyelination in the subcortical region of the left mid parietal lobe. (R. 398.) The MRI of the cervical spine revealed:

> Large disc herniations at C5-6 and C6-7 with severe central spinal stenosis particularly at C5-6 with compression of the spinal cord at both levels and focal myelomalacia with the cord at the C5-6 level. Smaller disc herniations at C3-4 and C4-5 and relatively prominent check ligament posterior to the odontoid impressing upon the dural sac and slightly displacing the cord posteriorly without cord entrapment . . . .

(R. 399.)

---

[1] Hofffmann's sign is an abnormal reflex found in patients with damaged pyramidal tracts of the brain. Flexion of the distal interphalangeal joint of the middle finger makes the thumb of the same hand flex and adduct. Donald Venes, *Taber's Cyclopedic Medical Dictionary* (20th ed. 2005).

On July 24, 2007, Laskowski had an anterior discectomy at C5-6 and C6-7 using bank bone grafts and an anterior fixation plate. (R. 392.) Dr. Yuk wrote on September 10, 2007, that Lakowski was under his care for "a serious cervical spine problem" without any recent injury. It was his opinion that inappropriate ergonomics associated with her job could cause that type of problem in her spine. (R. 344.) Dr. Yuk's progress notes reveal that Laskowski was still experiencing some fingertip tingling and numbness, but that it was not functionally significant. (R. 385.) In addition, she had stiffness around her shoulder blades. It was Dr. Yuk's opinion that Laskowski should remain off work but could begin simple exercises. (*Id.*)

On September 12, 2007, Dr. Daniel J. O'Rourke of McHenry, Illinois, wrote to the Officer of Workers' Compensation stating that Laskowski had been seeing him for "severe disc herniations since July 2007." He explained that Laskowski developed severe neck pain and bilateral arm pain with some atrophy due to the requirements of her work as a rural mail carrier. Dr. O'Rourke also represented that Laskowski was diagnosed with severe radiculopathy at the C5-6 and C6-7 levels and underwent immediate neurosurgery. (R. 310.)

Similarly, Dr. Yuk wrote to Officer of Workers' Compensation on October 3, 2007, stating that the studies showed some arthritic changes at C5-6 that could be aggravated by the repetitive stress on her neck while performing work duties. According to Dr. Yuk, at least two more months of healing was required before he could determine whether Laskowski was capable of returning to work. (R. 384.)

Dr. Yuk released Laskowski to part-time work with restrictions on December 6, 2007. (R. 382.) She was still experiencing tingling and needed more physical therapy. (R. 382,

3

430.) On December 12, 2007, Laskowski accepted an offer of modified assignment with the United States Postal Service. (R. 352-353.) However, on January 10, 2008, Dr. Yuk noted that Laskowski was experiencing increased tingling in her fingers. (R. 383.) X-rays showed no definite new bone formation at the level of the bone graft. (R. 453.)

By February 14, 2008, Laskowski had increased her work schedule to six hours a day, six days a week with lifting restrictions. Dr. Yuk opined that she had reached a level of maximum medical improvement and that her limitations would be permanent. (R. 380.) Laskowski was next seek by Dr. Yuk on October 16, 2008, at which time she was doing "ok" with some twitching on the left with neck stiffness. She was positive for Hoffmann's and Dr. Yuk recommended conservative treatment for her bulging discs in the lumbar spine. (R. 379.) On November 12, 2008, Dr. Yuk limited Laskowski to lifting less than twenty pounds and never above shoulder level. (R. 351.)

A July 15, 2009, MRI revealed bilateral moderate facet joint hypertrophy and artropathy along with a synovial cyst causing minimal impingement in the theacal sac at the L1-2 level. At L4-5 there was diffuse posterior disc bulge causing minimal impingement on the thecal sac and L5 nerve roots. (R. 320, 374, 387.)

Dr. Douglas Soat performed a psychological evaluation on November 29, 2010. Laskowski described the pain in her back which worsened with stress, as well as the neck stiffness. During the examination, Laskowski cried and reported that she worries constantly. Laskowski indicated that she feels depressed everyday and referred to herself as "damaged goods." Dr. Soat diagnosed a pain disorder associated with psychological factors and general medical condition, generalized anxiety disorder, major depressive disorder, recurrent mild severity. He assigned Laskowski a GAF of 60. (R. 463.)

On July 8, 2011, Laskowski saw Dr. O'Rourke who referred to her pain as "chronic, severe." (R. 494.) He prescribed Vicodin every six hours. (*Id.*)

During the September 28, 2011, hearing, Allen Howard, a psychologist, testified as a medical expert. He classified Laskwoski's mental impairment as "mood disorder, not otherwise specified, with symptoms of pessimism, discouragement, frustration, irritability, and worry." Moreover, Howard mentioned that it was a reactive disorder to pain, financial stressors and change to essentially a sedentary lifestyle. (R. 66.) According to Howard, Laskowski has a mild impairment inasmuch as she remained "independent and self directed" attending to "her personal and other needs as well as decision making." (*Id.*)

In his October 2, 2011, decision, the ALJ found that from November 3, 2009, through December 16, 2010, Laskowski was unable to perform any past relevant work as a production assembler or mail carrier inasmuch as she was suffering from the following sever impairments: degenerative joint disease, history of central stenosis causing spinal cord compression (status post discectomy and fusion) and depression. (R. 26-32.) However, beginning December 17, 2010, Laskowski did not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 32.) Additionally, the ALJ determined that medical improvement occurred as of December 17, 2010. (R. 33.) In support, the ALJ cited Dr. Yuk's notes from March 16, 2011, finding that Laskowski had "reasonable strength and a steady gait" and that the low back pain was "tolerable." (R. 33.)

The ALJ found that Laskowski had the residual functional capacity to perform less that the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). At the time of the hearing, she was able to lift and carry 20 pounds occasionally and 10 pounds

5

frequently, and was able to sit for six hours and stand or walk for six hours in an eight-hour day. She was only available for simple repetitive tasks, and able to understand, remember, and carry out simple instructions. (R. 34.) Although he found that Laskowski's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning December 17, 2010, to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (R. 34.) The ALJ commented that Laskowski was able to manage most of the activities of daily living, including doing laundry, making meals, making the beds, and light cleaning. (*Id.*). He further relied on Dr. Chan's Physical RFC Assessment and Dr. Musholt's Mental RFC Assessment, both dated December 16, 2010. The ALJ afforded Dr. Yuk's March 2011 opinion "some weight but not controlling weight" because Dr. Yuk did not have recent objective imaging studies available, performed a limited physical examination, and did not explain why continuing the limitations put in place more than a

year before remained appropriate. (R. 35.)

## STANDARD OF REVIEW

In reviewing the decision of the Commissioner, the court will affirm if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "evidence a reasonable person would accept as adequate to support the decision." *Prochaska v. Barnhart*, 454 F.3d 731, 734–35 (7th Cir. 2006). The court does not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Further, a decision denying benefits

6

must provide "an accurate and logical bridge" between the evidence and the ALJ's conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). While the ALJ "need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion" and "may not ignore entire lines of contrary evidence." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

ANALYSIS

Laskowski raises four issues on appeal: (1) the ALJ did not comply with the legal standards controlling the evaluation of treating source statements with respect to Dr. Yuk; (2) the ALJ utilized standard boilerplate language widely criticized in this circuit in determining that her statements were not credible beginning December 17, 2010, to the extent they were inconsistent with the residual functional capacity set forth in the decision; (3) the ALJ stated that he assigned "great weight" to the state agency physician's opinions but "cherry picked the record" and skipped portions inconsistent with his position; and (4) the ALJ relied on testimony of his vocational expert but did not properly evaluate contrary vocational evidence of the record.

The court agrees with Laskwoski that the shortcomings in the analysis require a remand to allow the ALJ to build the required bridge from the record to the credibility determination. The ALJ determined that Laskowski's "statements concerning the intensity, persistence and limiting effects of these symptoms" were "generally credible" prior to December 16, 2010, but "not credible beginning December 17, 2010, to the extent they are inconsistent with the residual functional capacity assessment." (R. 34.) This is the same boilerplate language that the Seventh Circuit Court of Appeals repeatedly criticizes because it suggests that the claimant's ability to work is determined first and then used to determine

7

credibility. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). Indeed, the ALJ determined that Laskowski's residual functional capacity increased beginning December 17, 2010, prior to his discussion of her credibility after that date.

Mindful that the court may uphold the credibility finding if the ALJ offers specific reasons to disbelieve the claimant's testimony, *Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012), the "specific reasons" offered by the ALJ are limited to a brief discussion of Laskowski's testimony regarding her activities of daily living. An ALJ may consider whether Laskowski's daily activities are inconsistent with her alleged inability to work. *See* SSR 96–8p; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, he may not ignore her testimony regarding the limitations on those activities. In his decision, the ALJ wrote:

> The claimant's testimony revealed that she is able to manage most activities of daily living, including doing laundry, making meals, making the beds, and light cleaning. She indicated that she sits and watches television and likes to read a lot. She can drive a car for an hour or two at a time, indicating an ability to sit for an extended period. She can go out grocery shopping and walks to get the mail. Her testimony is credible and demonstrates and [sic] ability to sit or stand for more than 4 to 6 hours in an 8-hour day. Accordingly, her residual functional capacity has increased.

(R. 35.)

That summary ignores Laskowski's testimony that she only cooks "occasionally" and that she is "shot" if she overdoes it with mopping or vacuuming. (R. 60.) Similarly, she "occasionally" goes out to get the mail and only shops for groceries with her husband. Laskowski also testified that she still has numbness in her fingertips causing her to drop things, pain in her neck for which she takes Vicodin, Celebrex, Skelaxin and Ibuprofen. According to Laskowski, she can sit for twenty or thirty minutes before having to walk

8

around or, alternatively, stand for one to two hours. Nevertheless, the ALJ concluded that she could sit or stand more than 4-6 hours in an 8-hour day.

The ALJ's determination of Laskowski's credibility for the period after December 17, 2010, also ignores Laskowski's written reports. Notably, on July 11, 2010, Laskwoski described limitations on her household activities. While she tries to accomplish daily chores, she must "rest in between due to pain." She also wrote that she takes Vicoden and muscle relaxants daily, but that it is hard to accomplish much due to limitations and neck and back pain. Laskwoski's husband and friends help her as needed as the pain severity varies day to day. (R. 256.) On bad days, she does not get dressed because of pain and stiffness. (*Id.*)

Additionally, the September 14, 2010, disability report indicated that Laskowski's condition had changed for the worse based on arthritic changes in the cervical vertebrae. Her neck felt stiff and felt like it was "in a vice." She could not lift more than ten pounds and the pain was getting worse. Laskowski wrote that she had a hard time doing the things she used to do and did not walk well. She was experiencing numbness and tingling in her fingers, and "could hardly take care of" herself. (R. 271-274.)

By January 11, 2011, Laskwoski reported that there had been no change, and that her mental health was reduced to single repetitive tasks. Doctors told her that her spine should not have added pressure because there would be damage at the fusion site. Moreover, Laskowski reported that her neck pain increased with activity and that she experienced a decreased range of motion. In addition, she wrote "tingling lower back pain lift less than ten pounds sit less than 45 minutes typically 30 minutes ambulate- tense, stiff use hand rails whenever possible." (R. 277-280.) She added that her house was in

9

foreclosure, car repossessed, and her workers' compensation claim remained pending. (R. 280.)

The ALJ discussed some of these limitations earlier in his decision to support his finding of disability prior to December 16, 2010, but he did not take these limitations into consideration when assessing the credibility of Laskowski's statements concerning the intensity, persistence and limiting effects of the symptoms after that date. (R. 28, 30.) It is well established that the administrative law judge "cannot ignore a line of evidence that suggests a disability." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

Aside from the "cherry picking" of Laskowski's testimony, the problem with resting the credibility determination on several selected activities has been explained by the Seventh Circuit as follows:

> [t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson*, 671 F.3d at 647. More recently, the Seventh Circuit called it "naiveté" for an ALJ to "equat[e] household chores to employment" and to "attach[ ] great weight to the applicant's ability to do laundry, take public transportation, and shop for groceries" in determining the applicant's credibility. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013).

Ultimately, daily activities are just one of the factors to be considered. The seven factors relevant to a claimant's pain apart from objective medical evidence. 20 C.F.R. § 404.1529(c). The ALJ must consider the following: i) a claimant's daily activities; ii) the location, duration, frequency, and intensity of a claimant's pain or other symptoms;

10

iii) precipitating and aggravating factors; iv) the type, dosage, effectiveness, and side effects of any medication a claimant takes or has taken; v) treatment a claimant received; vi) any measures a claimant uses or has used to relieve pain or other symptoms; and vii) other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Here, it is difficult to determine from the ALJ's decision whether he considered such things as the intensity or duration of Laskowski's pain, the dosage, effectiveness or side effects of her medication, or any measures used to relieve her pain.

The Commissioner insists that no matter how "awkwardly contructed the 'boilerplate' statement may be, it is clear that the ALJ did defer making a credibility finding until he had first decided upon Laskowski's residual functional capacity." (Doc. 16 at 10.) However, it is not clear to this court that the ALJ made the credibility finding first, or otherwise supported his decision with substantial evidence from the record. Moreover, nowhere in the decision does the ALJ state how he concluded that medical improvement occurred on or after a particular date. While the court can speculate that the physical and mental RFC assessments completed by the state agency consultants led to this inference, both state agency consultants found Laskowski to be "wholly credible." (R. 486, 489.) Ultimately, the ALJ's decision to find her testimony not credible after December 16, 2010, is so unclear that this court cannot give it meaningful review. Hence, this is one of those occasions where the court must disturb the ALJ's credibility determination.

Because this case has to be remanded, the court urges the ALJ to take the opportunity to clarify the basis for his decision to assign controlling weight to the opinion of Laskowski's treating physician, Dr. Yuk, prior to December 16, 2010, but only "some weight"

11

to Dr. Yuk's opinion after that date. The ALJ must accord the medical opinion of a treating physician controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2). In the decision, the ALJ does not explain how Dr. Yuk's March 2011 opinion is inconsistent with other substantial evidence. Further, the decision should "sufficiently account for the factors" set forth in 20 C.F.R. § 404.1527 and build an adequate bridge from the evidence to the conclusion. *Schreiber v. Colvin*, 519 F. Appx. 951, 959 (7th Cir. 2013). The ALJ speculated that Dr. Yuk needed further imaging studies or otherwise conducted a limited examination, but Dr. Yuk's examination revealed continuing pain, Laskowski's numbness was unchanged, she exhibited prominent Hoffman's signs, positive cross adductors and he found no significant change in her overall condition. As Laskowski's treating physician over a number of years, Dr. Yuk concluded that there was no need to change activity level, particularly in light of the "highlighted evidence of myleomalacia on preoperative MRI." (R. 492.) Once the ALJ revisits the issues discussed above, he may heed to reconsider or clarify his approach at steps four and five. Now, therefore,

IT IS ORDERED that the decision of the Commissioner is reversed.

IT IS FURTHER ORDERED that this decision is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 21st day of February, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE